# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PUBLIC SCHOOL TEACHERS' PENSION & RETIREMENT FUND OF CHICAGO and CITY OF ATLANTA FIREFIGHTERS' PENSION PLAN, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>    v.<br><br>NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,<br><br>         Defendants. | Civ. A. No. 10-619<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

## CLASS ACTION COMPLAINT

Plaintiffs the Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") and the City of Atlanta Firefighters' Pension Plan ("Atlanta Firefighters"), on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege the following based upon knowledge, with respect to their acts, based upon facts obtained through the investigation by their counsel, and based upon information and belief where indicated.  Chicago Teachers and Atlanta Firefighters bring this action on their own behalf and on behalf of a Class of all similarly situated persons (as defined below) whose assets were invested, directly or indirectly, in certain funds managed by Defendant Northern Trust Company ("NTC") and Defendant Northern Trust Investments, N.A. ("NTI" and collectively, "Northern Trust" or "Defendants") and/or participated, directly or indirectly, in a securities lending program Defendants administered.  Plaintiffs and the Class seek damages and equitable relief to remedy Defendants' breaches of contract and fiduciary duty and other causes alleged herein.

## I.  INTRODUCTION

1.      This is a case about a fiduciary charged with investing client assets in conservative, highly liquid, ultra-short term investment funds that, in flagrant violation of its duties, instead locked those funds into risky, long-term investments – including hundreds of millions of dollars of unregistered, illiquid securities that plummeted in value.

2.      Northern Trust operates a securities lending program (the "SLP") in which Plaintiffs and the Class participate, either directly or indirectly.  As explained more fully below, through the SLP, Defendants lend out securities belonging to Plaintiffs and the Class and receive cash and other collateral to secure those loans.  Defendants then invest the cash collateral in several collective investment pools (the "Collateral Pools"), which include the Short Term Extendable Portfolio ("STEP") and the Core USA Collateral Section ("Core USA").

3.     The Collateral Pools sought to achieve conservative returns, and their primary focus was on preserving capital and maintaining liquidity.  Because the cash invested in the Collateral Pools was mere collateral for loaned securities, which had to be returned to the borrowers of the securities upon the termination of the loan, all of the Collateral Pools were to be invested in highly conservative, short-term investments designed to maintain liquidity.

4.     Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class by imprudently investing the Collateral Pools, including STEP and Core USA, in risky and long-term securities.  For example, as of July 31, 2007, almost 70% of the securities held in STEP were not due to mature for over a year-and-half, and over 20% of the securities in STEP were not due for at least 10 years.  The STEP portfolio included hundreds of millions of dollars in exotic, unregistered securities issued by "structured investment vehicles" or "SIVs"—entities that were recently identified in hearings before the congressional Financial Crisis Inquiry Commission as one of the "causes of the financial crisis" that "served no good or productive purpose in the financial system"—and millions more in securities backed by risky residential mortgages and other consumer loans.  Both STEP and Core USA held hundreds of millions of dollars of securities backed by mortgages and other consumer loans, and billions more in securities issued by banks with massive exposure to mortgages and consumer loans.

5.     Indeed, notwithstanding the warnings of Northern Trust's own Chief Economist as early as 2004 that major banks held excessive exposure to the inflation of the U.S. residential housing market, Defendants filled the Collateral Pools, including STEP and Core USA, with securities issued by such banks.

6.     Defendants were motivated to build STEP and Core USA around such risky, long-term securities because of a compensation scheme that gave rise to a conflict of interest.

Specifically, because Northern Trust shared in the returns generated from the investment of cash collateral in the Collateral Pools—taking up to 40% of the earnings in the Pools—but bore no downside risk on losses in the Collateral Pools, Defendants stood to materially gain by investing the Pools in securities that stood to generate higher returns, regardless of the additional credit and liquidity risk inherent in those investments or the fact that they were wholly inappropriate for conservative, short-term, liquid funds like STEP and Core USA. On information and belief, this conflict drove Defendants to invest STEP and Core USA in risky and long-term securities, and to maintain significant exposure to mortgage-backed securities, exotic investments backed by mortgage-backed securities and securities issued by financial institutions that themselves had significant exposure to those same mortgage markets, which were inappropriate for the Collateral Pools.

7.      Then, as the very risks about which Northern Trust's Chief Economist had warned were realized and the collapse of the subprime mortgage market caused those banks to disclose billions of dollars in losses, Defendants took the imprudent position that the securities held in STEP and Core USA would pay off if held to maturity. For over a year, in the face of evidence that the mortgage crisis was developing into a broader economic crisis that threatened to cause significant losses to the Collateral Pools, Defendants refused to divest of the risky and long-term securities in the Collateral Pools. Indeed, even as STEP and Core USA incurred mounting unrealized losses from mid-2007 through mid-2008, Defendants failed to take the steps necessary to actively mitigate the risk they had created by selling risky and long-term investments.

8.      On information and belief, that decision was driven by a conflict of interest that prevented them from selling securities in the Collateral Pools at a loss, even if done to mitigate

3

risk and avoid potentially larger losses. Specifically, according to internal Northern Trust documents, in the event a Collateral Pool incurred a realized loss (such as by selling securities at a loss), Northern Trust would be required by accounting rules to consolidate the entire Collateral Pool onto its books, which could result in a multi-billion dollar loss to Defendants, if investors in the Collateral Pool failed to offset that loss. Thus, by continuing to hold securities that had incurred unrealized losses, and which were at risk for further loss, Defendants sought to avoid the potential that Northern Trust would be forced to consolidate the Collateral Pools. On information and belief, Northern Trust's self-interested concern about the risk of consolidation—rather than an unbiased assessment of the best interests of Plaintiffs and the Class—prevented Defendants from prudently disposing of moribund Collateral Pool assets in the face of the subprime mortgage collapse and growing financial crisis.

9. As a result, and despite the clear warning signs discussed herein, Defendants continued to hold high-risk securities in the mere hopes that the issuers of those securities would survive the financial crisis—an investment decision informed by Defendants' own self-interest in avoiding consolidation of the impaired Collateral Pools. Yet months before the first securities held in STEP and Core USA defaulted, resulting in massive realized losses, Defendants recognized that the Collateral Pools were no longer appropriate, conservative investments for SLP participants. Indeed, a Northern Trust executive has testified that, by April 2008, Defendants "would not be going out and selling STEP as an investment vehicle to new prospects."

10. As a result of Northern Trust's conduct in imprudently structuring and managing the Collateral Pools, in September 2008, STEP and Core USA incurred massive realized losses when two "structured investment vehicles" that issued exotic, illiquid securities held in STEP

4

and when Lehman Brothers, a bank that months earlier disclosed exposure to billions of dollars in losses tied to mortgage-backed securities, and whose securities were held in STEP and Core USA, collapsed.

11.     On the grounds that those losses had impaired the liquidity of the Collateral Pools, Defendants then limited withdrawals from the Collateral Pools, effectively locking Plaintiffs and the Class into the risky, long-term investment strategy Defendants had implemented for these purportedly conservative, short-term funds.  As a result, Plaintiffs and the Class suffered more harm as STEP and Core USA incurred additional realized losses due to Defendants' breaches of their fiduciary and contractual obligations.

12.     Despite the fact that the losses in the Collateral Pools were the direct result of Defendants' mismanagement, Northern Trust took the position that SLP participants—including Plaintiffs and the Class—were responsible for those losses.  Accordingly, Northern Trust took steps to compel Plaintiffs and the Class to contribute hundreds of millions of dollars to the Collateral Pools to offset the losses Defendants had caused.  First, in the months following the Lehman Brothers collapse, Defendants improperly redirected earnings from the Collateral Pools that were due to Plaintiffs and the Class and allocated those monies to offset the losses in the Collateral Pools.  Because those earnings were insufficient to fully offset the realized losses in the Collateral Pools, Northern Trust then demanded that Plaintiffs and the Class provide lump-sum payments totaling millions of dollars in additional payments to further offset the losses in the Collateral Pools.  Through this Action, Plaintiffs and the Class seek to recover the earnings improperly seized by Northern Trust, the amounts paid to Northern Trust in response to Defendants' improper demand, to remove the withdrawal limitations that prevent Plaintiffs and the Class from exiting the SLP, and a judgment that Defendants are liable for realized losses that

5

have not been paid by Plaintiffs or the Class and for the remaining unrealized losses in the Collateral Pools incurred as a result of their misconduct.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  The amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs and at least one member of the class of plaintiffs is a citizen of a different state than at least one defendant.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391.  Substantial acts in furtherance of the alleged wrongdoing and/or their effects have occurred within this District, and defendant NTC's principal place of business is in Chicago, Illinois.

## III.   THE PARTIES

15.    Plaintiff Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") is a public pension fund established for the exclusive benefit of teachers and certain other employees of the Chicago Public Schools.  Chicago Teachers serves over 24,000 retirees and 32,000 contributing members, and has over $9.2 billion in assets under management.  Chicago Teachers participates directly in the SLP, and the cash collateral it received through the SLP was invested in the Collateral Pools, including STEP.  Chicago Teachers also participates indirectly in the SLP through its investment in the S&P 400 Special Purpose Midcap Fund, a collective investment fund managed by Defendants that participated in the SLP.

16.    Plaintiff City of Atlanta Firefighters Pension Plan ("Atlanta Firefighters") is a public pension plan established for the benefit of Atlanta firefighters and their beneficiaries. Atlanta Firefighters participates directly in the SLP, and the cash collateral it received through

the SLP was invested in the Collateral Pools, including Core USA.

17.     Defendant Northern Trust Investments, N.A. ("NTI") has its principal place of business in Chicago, Illinois.  NTI acts as a trustee to the Collateral Pools that invested the cash collateral provided by borrowers in the SLP.  At all relevant times, NTI was and is a fiduciary to Chicago Teachers and Atlanta Firefighters and all members of the Class and was obligated to act with prudence, due care, good faith and loyalty in investing and managing the collective funds and Defendants' securities lending program.

18.     Defendant Northern Trust Company ("NTC") has its principal place of business in Chicago, Illinois.  NTC served as a securities lending agent for Chicago Teachers and Atlanta Firefighters and all direct and indirect participants in the SLP, with responsibility for administering the SLP, including negotiating and entering into agreements with securities borrowers, receiving borrowers' collateral and matching borrower loan requests with the eligible securities of SLP participants.  At all relevant times, NTC was and is a fiduciary to Chicago Teachers and Atlanta Firefighters and all members of the Class and was obligated to act with prudence, due care, good faith and loyalty in administering the SLP, including overseeing the management and investment of collateral received for lent securities.  NTI and NTC are sometimes referred to herein collectively as "Northern Trust" or "Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

   A.     **Northern Trust's Securities Lending Program**

19.     Since 1981, Northern Trust has been one of the largest providers of securities lending services for public retirement systems, foundations, endowments, insurance companies, and ERISA-qualified plans.  Through Northern Trust's securities lending program, Plaintiffs and the Class sought to earn incremental returns by lending eligible securities from their portfolios—

including corporate equities, corporate bonds, and government securities—to approved borrowers in return for cash and other collateral. The cash collateral received from securities borrowers is reinvested in one or more comingled funds, or Collateral Pools, managed by NTI. The Collateral Pools funds—which were all purportedly invested in short-term, conservative and highly liquid fixed income securities that generate predictable returns—include the Core USA Collateral Section ("Core USA"), the Collective Short Term Extendable Portfolio ("STEP") and the Collective Short Term Investment Fund ("STIF").

20.     Traditionally, the reinvestment income generated through investments in the collateral pools has been used by securities lending participants to offset expenses associated with maintaining the portfolio (such as custody costs or brokerage commissions), to maximize overall portfolio performance, or for some participants to lower a portfolio's effective tax rate through dividend arbitrage. Accordingly, investment of collateral through the SLP was intended to generate only modest returns, with a primary focus on preservation of capital and liquidity to ensure that the cash collateral could be returned to borrowers upon the termination of the securities loan.

21.     The borrowers who tender that cash collateral in exchange for the loaned securities often use borrowed securities to cover an already established short position, hedge an investment (such as an equity derivative or convertible bond), or take advantage of an arbitrage opportunity. In order to borrow a security through the securities lending program, borrowers are required to put up collateral worth at least 102 percent of the borrowed security's current market value to secure their obligation to return the securities when the loan is either called back or matures. The value of the borrowed security is monitored on a daily basis, and the borrower is required to maintain the same 102 percent collateral even if that value fluctuates.

8

22.     When the loan matures or is called back, the borrower returns the security and gets back the collateral it originally posted.  The borrower also receives interest on the collateral, known as the rebate, for the use of the cash collateral.  The amount of the rebate is intended to reflect the intrinsic value of the loaned security and the fact that some securities are more highly sought after than others—the higher the demand for the security, the lower the rebate that will be paid.  Accordingly, the collateral reinvestment must only generate a higher return than the rebate promised back to the borrower in order for the participating lender to realize a return.  The earnings from the collateral reinvestment generated above the rebate rate equals the "lending spread" and represents the profit in the transaction.  This profit is split between the participating lender and Northern Trust based upon a revenue sharing arrangement, with Northern Trust typically entitled to up to 40 percent of the lending spread, in addition to any fees otherwise charged by Northern Trust.

23.     Plaintiffs and the Class could participate in the SLP either directly or indirectly (or both).  Direct participants in the SLP entered into a securities lending agreement with Northern Trust which allowed Northern Trust to lend out securities from their own investment portfolios and which imbued Northern Trust with discretion to invest the collateral received from those loans in one or more specified Collateral Pools.  Confronted with the massive losses in the Collateral Pools, Defendants seek to hold direct SLP participants liable for those losses by redirecting earnings due to those direct SLP participants to offset such losses and demanding cash payments from direct SLP participants to further offset losses.

24.     Indirect SLP participants invested in commingled investment funds established and managed by Northern Trust (the "Commingled Lending Funds"), which in turn participated in the SLP.  The Commingled Lending Funds act as direct participants in the SLP, and entered

into a securities lending agreement with Northern Trust, which allowed Northern Trust to lend out securities held in the Commingled Lending Funds for the benefit of investors in those funds, and which imbued Northern Trust with discretion to invest the collateral received from those loans in one or more specified Collateral Pools. On information and belief, Defendants caused the Commingled Lending Funds to make payments to offset losses in the Collateral Pools, and thereby caused harm to Plaintiffs and the members of the Class who invested in the Commingled Lending Funds.

25. Each of the Commingled Lending Funds was set up as a commingled fund, also referred to as a "Participating Trust," pursuant to a Declaration of Trust. The Commingled Lending Funds were established for the collective investment of a group of investors. All the investors in each commingled fund shared, pro rata, in any gains and losses for the Fund. During 2007 and 2008, Northern Trust's Collective Funds Trusts held over fifty commingled funds. NTI created each commingled fund that was offered to participants in the Plans by executing a Fund Declaration that described each Commingled Lending Fund's investment policy and objective. For example, the Aggregate Bond Fund's investment objective was to approximate the overall performance of the Lehman Brothers Aggregate Bond Index. The Fund Declarations for the Commingled Lending Funds stated that the Commingled Lending Funds "may participate" in securities lending, and that the "lending agent" – Northern Trust – would "indemnify, defend and hold harmless the [Commingled Lending Funds] from and against any losses, damages, costs, and expenses the [Commingled Lending Funds] may incur as a result of failure of the lending agent to perform its duties and responsibilities under the lending agreement."

26. Northern Trust served as a fiduciary to Plaintiffs and the Class in connection with

the management of the SLP and, in particular, the investment of collateral in the Collateral Pools. As the investment manager charged with managing the investment of the Collateral Pools for the benefit of both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

27. Documents created by Northern Trust, including materials that described and explained the SLP, acknowledge that "Northern Trust considers its Securities Lending Program as a fiduciary duty [and] Northern Trust recognizes that it is responsible for any losses that an account may suffer as a result of its failure to perform its fiduciary duties."

28. Northern Trust's status as a fiduciary was incorporated into the securities lending agreements signed by Plaintiffs and, on information and belief, the Class. For example, the securities lending agreements that Plaintiffs and members of the Class entered into with Northern Trust incorporate by reference the Federal Financial Institutions Examination Council Supervisory Policy on Securities Lending ("FFIEC Policy"), which states that a "lender institution which exercises discretion in offering securities on behalf of and for the benefit of customer-owners is acting as a fiduciary. For purposes of these guidelines, the underlying relationship may be as agent, trustee, or custodian."

29. This obligation, and Northern Trust's general obligation to prudently manage the Collateral Pools for the benefit of Plaintiffs and the Class, was made explicit in the securities lending agreements that Plaintiffs and the Class entered into. Specifically, through that agreement, Northern Trust agreed to "indemnify and hold harmless" Plaintiffs and members of the Class "for any direct losses, damages, costs and expenses (including reasonable attorney

11

fees) [they] incur[] resulting from…Northern's failure to…make a reasoned determination of the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

30.     In the securities lending agreements, Northern Trust also agreed to "indemnify and hold harmless" members of the Class for "any direct losses, damages, costs and expenses (including reasonable attorney fees)" for failure to comply with the FFIEC Policy.  Under the FFIEC Policy, Defendants were obligated to invest the cash collateral in safe, liquid instruments. Specifically, the FFIEC Policy states that "[g]enerally, a lender institution will invest cash collateral in repurchase agreements, master notes, a short term investment fund, U.S. or Eurodollar certificates of deposits, commercial paper or some other type of money market instrument," and the "lender institution is responsible for making [the cash collateral] income productive."

31.     As set forth herein, Defendants breached their contractual and fiduciary duties to Plaintiffs and the Class through their imprudent management of the Collateral Pools, which caused Plaintiffs and the Class to incur significant losses and be subjected to further losses as a result of withdrawal limitations imposed by Defendants.

**B.      Defendants Improperly Managed The Collateral Pools**

32.     The Collateral Pools, including STEP and Core USA, were purportedly conservative, short-term and highly liquid investment funds.  Because the collateral received from securities borrowers was essentially borrowed money that had to be returned to the borrowers upon the remittance of those securities, Defendants were required—both by contract and by the prudent investor standard that governs their fiduciary duty—to invest the cash collateral conservatively and prudently in safe, liquid instruments.  Moreover, because Plaintiff

and members of the Class bear all the risk of loss in the Collateral Pools, Defendants were obligated to ensure that their investment decisions were made purely in the interests of those investors, and did not sacrifice safety and liquidity in exchange for higher returns. Not only was it critical for Defendants to invest Collateral Pool assets in safe, short-term instruments to guard against losses arising from default, but also to maintain adequate liquidity consistent with the narrow purpose of the Collateral Pools.

33. Defendants disregarded those obligations and sought out higher returns in the Collateral Pool by investing in risky and long-term securities, which exposed these purportedly short-term, liquid Pools to significant credit and liquidity risk. The risks inherent in Defendants' improper structuring of the STEP and Core USA portfolios were first realized in 2007, when financial firms in which the Collateral Pools invested disclosed exposure to losses on mortgages and other consumer loans.

34. In the face of those developments, which a sophisticated investor such as Northern Trust should have recognized as posing significant risk to the Collateral Pools in light of the imprudent manner in which Defendants had invested the Pools, Defendants again breached their fiduciary and contractual duties by failing to prudently respond to the clear signs of a growing crisis. Indeed, rather than actively manage STEP and Core USA to mitigate the risk they had created, Defendants adopted the untenable positions that securities held in STEP and Core USA would pay fully if held to maturity, and that securities that incurred unrealized losses (when the market value of the security fell below the book value of the security) would not be sold. Because Defendants had populated STEP and Core USA with long-term securities, many of which would not mature for decades, that decision effectively converted STEP and Core USA from "ultra short-term" funds to long-term funds, which were not appropriate for the investment

13

of securities lending collateral.

1. **Defendants' Improperly Structured STEP And Core USA By Investing In Long-Term, High-Risk And Illiquid Securities**

   a. **STEP And Core USA Were Structured As Long-Term Investment Funds**

35.     Northern Trust established STEP as "an ultra-short duration total return fund that seeks to outperform high-grade, short-term money market instruments."  Moreover, STEP was purportedly appropriate for investors with an investment horizon of just one year.  Similarly Core USA was to be a highly conservative, short-term fund in which cash collateral was to be invested to generate returns "consistent with the preservation of capital and maintenance of liquidity," with "liquidity and principal preservation as prime objectives" of the fund.

36.     Defendants violated their fiduciary and contractual duties by structuring the Collateral Pools as long-term investment funds.  For example, of the securities held in the STEP portfolio as of July 31, 2007,

- 76% were not due for at least another 12 months;

- 69% were not due for at least another 18 months;

- 54% were not due for at least another 2 years;

- 21% were not due for at least another 10 years;

- 18% were not due for at least another 20 years;

- 9% were not due for at least another 30 years.

37.     Similarly, Core USA held billions of dollars worth of securities that would not mature for years.  Indeed, as of October 2008, over 30% of the securities held in Core USA were not due to mature for over 2 years.

38.     Those long-term securities were wholly improper for "ultra-short term" funds

14

such as STEP and Core USA, and exposed Plaintiffs and the Class to significant credit and liquidity risk.

### b. Defendants Invested STEP And Core USA In High-Risk And Illiquid Securities

39. STEP and Core USA were imprudently exposed to significant losses related to the U.S. mortgage market and other consumer loans. Despite the warnings of Northern Trust's own Chief Economist, discussed *infra*, that inflation in the mortgage markets presented significant risks to banks that held mortgage-backed securities, the Collateral Pools held billions of dollars of securities issued by such banks, as well as holding mortgage-backed securities and securities issued by exotic "structured investment vehicles" that traded in asset-backed securities, including those backed by residential mortgages.

40. Indeed, as of October 2008, over 80% of the investment securities held in Core USA were asset-backed securities—including securities backed by mortgages and other consumer loans—and securities issued by banks and financial institutions which themselves were exposed to mortgages and other consumer loans. As of October 2008, the Core USA collateral pool directly held over $2.8 billion in mortgage-backed securities—almost all of which were not due to mature for at least another ten years. Of the more than $7.6 billion in asset-backed securities held in Core USA as of October 2008, 80%—or over $6.3 billion—were not due to mature for over two years.

### c. STEP Held Exotic, High-Risk Structured Investment Vehicles

41. In addition to the long-term and high risk securities, discussed above, that were held in the Collateral Pools, STEP faced further risk because it held other exotic, illiquid securities. Specifically, as of July 31, 2007, over 15% of the securities in STEP were invested in

unregistered securities—securities which, by definition, can only be sold under certain narrow circumstances and for which there is no ready market. Those unregistered securities included investments in two structured investment vehicles ("SIVs"). SIVs are a type of structured investment product which operate similar to banks by borrowing money by issuing short-term securities (such as medium-term notes and commercial paper) at low interest rates and then lending that money by buying long-term securities (including mortgage-backed securities) at higher interest, making a profit for investors from the difference in the interest rates.

42.     The two SIVs whose securities were held in STEP—Sigma Finance and Theta Finance—which were created and managed by the United Kingdom-based investment management company, Gordian Knot, were heavily reliant on their credit ratings in order to continue to raise, and rollover, short-term funding. The notes issued by SIVs are exotic, high-risk investments that were outside the enumerated classes of securities that were permitted to be held in STEP. Moreover, because SIVs in general, and Sigma and Theta in particular, lacked an established track record, they were inappropriate investments for a conservative fund such as STEP.

43.     Sigma and Theta presented a higher risk than other SIVs because they were not sponsored by a major financial institution. Bank-sponsored SIVs, such as those sponsored by major financial institutions like Citigroup, have the ability to seek support from their sponsor in times of economic distress. The difference in risk profile between supported and unsupported SIVs was well known to Northern Trust, as revealed in a Northern Trust document from January 2008 that distinguishes between SIVs supported by sponsoring banks, and unsupported SIVs such as Sigma and Theta. The document, which describes the investment process and philosophy of Northern Trust's management of its Northern Fund money market funds, boasts a

prudent approach to investing in SIVs by noting that the money market funds' investment concentration in SIVs sponsored by major global banks was "intentional." Specifically, Northern Trust explains that "[b]ank sponsorship typically provides very strong implicit support via back-up liquidity lines of credit, management oversight, and credit quality discipline, not to mention a vested interest in the success of the SIV."

44. On information and belief, Defendants' decision to imprudently structure STEP and Core USA by investing in risky and long-term decisions resulted from a conflict of interest. Because Northern Trust shared in the earnings generated by the Collateral Pools, Defendants were motivated to invest the Pools in securities that generated higher returns. Because longer-term fixed income securities generally yield higher returns than comparable short-term securities, Defendants invested STEP and Core USA in longer-term securities—including securities that would not mature for decades. Because a longer-term security locks the investor in for an extended period, such securities generally carry higher credit risk—the risk that the issuer of the security may be unable to pay the obligation due at maturity—than comparable short-term securities. Similarly, high-risk securities, such as those issued by SIVs or backed by pools of residential mortgages or other consumer loans, pay a higher return than securities of a comparable term issued by governmental entities or established corporations.

45. Because Northern Trust bore no risk of loss if the investments in STEP and Core USA defaulted, Defendants accepted the additional risk presented by investing in risky and long-term securities in order to generate higher returns for themselves. In light of the nature of the Collateral Pools, which were purportedly conservative, short-term funds that were required to remain liquid so that the invested collateral could be returned to borrowers in the SLP, the additional returns earned by undertaking that risk was imprudent and unwarranted.

**2. Northern Trust Identified The Housing Bubble And The Economic Risk It Posed To The Investments In The Collateral Pools**

46.     Long before the Northern Trust securities lending program incurred the first losses tied to the collapse of the subprime mortgage market and the resulting financial crisis, Northern Trust determined that U.S. housing prices were highly inflated, that the inflation in the housing market was unsustainable and that the bursting of the housing bubble would have severe consequences for investors.

47.     Specifically, Northern Trust's Chief Economist, Paul Kasriel, wrote extensively about the unsustainable inflation in the U.S. housing market as early as 2004.  A report he issued in June of that year compared the housing market to the stock market in 1999 immediately before it experience a rapid decline in value.  The following month, Kasriel described the housing market as "an accident waiting to happen" and warned that "the most serious collateral damage from a housing bust would be a wounded U.S. banking system" because "U.S. commercial banks have become major investors in mortgage-related debt."  Kasriel noted the historical correlation between a distressed banking industry and investor losses.

48.     In the following years, Kasriel repeatedly warned about the state of the housing market and the impact its collapse would have on the economy.  Numerous media sources cited Kasriel's warning, in 2006, that the U.S. housing market was in a "recession" and that the housing market would "pull[] the economy down" in 2007.

49.     Defendants acknowledge Kasriel's acumen and prescience in predicting the housing bust and the impact on the financial markets, and that he "identified early on the formation of the housing bubble and *foreseaw the economic and financial market havoc that would ensue after the bubble inevitably burst*."  (Emphasis added).

18

50.     Thus, long before the first losses were incurred in the Collateral Pools, and at a time when Defendants could have restructured the Collateral Pools to avoid the risk presented by mortgage-backed securities, other asset-backed securities and the securities of financial institutions that, as Kasriel warned, faced significant risk from their own holdings of such mortgage-backed and asset-backed securities, Northern Trust was aware of the risks it had created in the Collateral Pools.

51.     Despite that knowledge, Northern Trust ignored the warnings of its own Chief Economist and kept the Collateral Pools, including STEP and Core USA, invested in securities with significant exposure to mortgage-backed securities, SIVs, and financial institutions that Kasriel warned were overly exposed to mortgage-backed investments.  Because many of those securities would not mature for years, the risk that the Collateral Pools would incur a material loss from the collapse of the housing bubble that Kasriel identified was highly likely.

> **3.     Defendants Failed To Prudently Respond To The Growing Economic Crisis**
>
> **a.     The Mortgage Meltdown And Disclosure Of Massive Losses By Banks That Invested In Mortgage And Consumer Debt Crystallized The Risk Facing The Collateral Pools**

52.     The risks that Kasriel warned of—that the housing collapse would bring down the economy and, in particular, the banks that had invested heavily in mortgages—were first realized in 2007.  The collapse of the subprime mortgage market in the first quarter of that year should have made clear to Defendants, given their sophistication and their access to Kasriel's prior warnings, the inherent risk in the long-term, illiquid portfolios Defendants built into the Collateral Pools, including STEP and Core USA.

53.     For example, in February 2007, HSBC—one of the world's largest banks, wrote

down the value of mortgage-backed securities it held by $10.5 billion, reflecting the significant decline in the value of such asset-backed investments. Just weeks later, the collapse of the nation's second largest mortgage lender, New Century, was the first in a series of major mortgage lenders that failed in the following months, with roughly 100 mortgage lenders failing by the end of the year. By virtue of its sophistication and the warnings it received from Kasriel, Northern Trust knew or should have known that those failures signaled that the web of securities built on mortgages and other consumer loans were at significant risk of failure. Those securities included mortgage-backed securities, such as those held in STEP and Core USA, SIVs that invested in those securities, such as Sigma and Theta, and the securities of financial institutions that were heavily invested in mortgage-backed securities and other investments backed by mortgages.

54. Indeed, it should have been clear to Northern Trust by mid-2007 that the subprime mortgage collapse implicated a broad array of investments held in the Collateral Pools. In June 2007, two multi-billion dollar hedge funds managed by Bear Stearns collapsed due to losses tied to subprime mortgages. By August 2007, numerous investment funds—including those managed by major banks, such as French bank BNP Paribas—reported significant losses as a result of the subprime collapse, and the resultant lessening of liquidity in the markets as investors steered away from asset-backed securities. Indeed, in an article published on August 13, 2007, *The Wall Street Journal* described the significant risks major financial institutions faced, writing "[e]xotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

55. If Kasriel's warnings, coupled with the warnings in the media and the collapse of hedge funds managed by Bear Stearns, BNP Paribas and others did not make clear to these

sophisticated Defendants the risk the major financial institutions faced from the subprime collapse, the final months of 2007 established that fact for Northern Trust. At the end of September 2007, Swiss banking giant UBS disclosed a quarterly loss of almost $700 million. In October 2007, Merrill Lynch disclosed a loss of $8.4 billion. That same month, Citigroup disclosed losses of $5.9 billion, which quickly grew to more than $15 billion, and revealed that it faced total exposure of $55 billion. All of those losses were tied, directly or indirectly, to the mortgage meltdown. Significantly, Citigroup also revealed that the SIVs it sponsored faced billions of dollars in losses due to investments in asset-backed securities, including those tied to mortgages.

      **b.**      **Northern Trust Ignored The Warnings Of Its Chief Economist, And The Evidence That The Mortgage Collapse Threatened the Collateral Pools**

56.      Defendants ignored the warnings of Northern Trust's Chief Economist, the failures of mortgage lenders, collapse of financial institutions, and disclosures of massive losses by major banks. All of those developments, taken together, demonstrated the significant risk facing the Collateral Pools as a result of the imprudent investments made by Defendants. In the face of the growing financial crisis, Defendants—having structured the purportedly conservative Collateral Pools, including STEP and Core USA, with securities issued by companies at the heart of the crisis—failed to act. Indeed, rather than restructuring the portfolios of those Pools to focus on short-term securities (which would reduce credit risk) and securities with less exposure to catastrophic losses, Defendants determined to stay on the perilous course they had chartered.

57.      Indeed, a comparison of the holdings in STEP in July 2007 and September 2008 demonstrates that Defendants failed to shift that "ultra-short term" fund from long-term investments to short-term investments. While in July 2007, over 76% of the securities in STEP

were not due for at least 12 months, in September 2008 over 71% of the securities in STEP were not due for at least 12 months. In both July 2007 and September 2009, approximately 20% of the portfolio was not due for at least 10 years, and just over 10% was due to mature within 6 months.

58. On information and belief, that failure was driven by a conflict of interest that prevented Northern Trust from managing the Collateral Pools wholly for the benefit of Plaintiffs and the Class. Specifically, Northern Trust was incented to avoid incurring realized losses by selling securities that were currently trading below book value because Northern Trust would be required to consolidate the entire Collateral Pools onto its books if it could not otherwise force Plaintiffs and the Class to cover losses realized from the sale of these impaired securities. Such consolidation would result in billions of dollars of losses to Defendants, as they would be required to write down the value of the impaired securities held in the Collateral Pools.

59. An internal Northern Trust document, discussing a call held between Northern Trust executives and a client impacted by losses in the SLP, reflects Defendants' understanding that "Back[ing] up the STEP fund" meant to "put the sub-par positions on our Books." Another internal Northern Trust document, entitled "Redemptions – Common and Collective Funds," states "Our independent auditor has advised that accounting rules require us to recover realized losses from securities lending advisors in order to avoid consolidation of all STEP fund assets onto our balance sheet." In an attempt to avoid a situation wherein Northern Trust was required to either recover hundreds of millions of dollars from its own clients or else consolidate billions of dollars in securities onto its balance sheet, Defendants determined that they would not sell these impaired securities at a loss, even if doing so would help to mitigate the risk of greater potential losses to Plaintiffs and the Class.

60.     Rather than selling the securities at risk of significant losses to refocus STEP and Core USA on the conservative, short-term securities that should have been in those funds, Defendants instead determined to wait for the high-risk securities in those Collateral Pools to mature, and ignored the clear risk that issuer of those securities, including those that had already disclosed material losses, might default or that unrealized losses would grow.  Given the long-term nature of those securities, Defendants' decision effectively locked Plaintiffs and the Class into a long-term investment with significant exposure to the financial crisis.

### C.     Defendants' Imprudence Results In Losses To The Collateral Pools

61.     In July 2007, the Collateral Pools incurred unrealized significant losses on several securities.  Rather than seeking to mitigate further losses, or even recognizing those losses as a further evidence of the risk facing the portfolios it had filled with long-term, high-risk instruments, Northern Trust imprudently determined to hold the impaired securities to maturity in the hopes that, despite the worsening economic climate, the investments would pay at maturity.  Given the long terms of the securities at issue—the losses incurred in July 2007 included bonds issued by Sallie Mae, some of which would not mature until October 2011—that decision was contrary to the purported nature of the short-term Collateral Pools.

62.     The following month the Collateral Pools again incurred significant losses, which Northern Trust knew or should have known were related to the collapsing mortgage market and the impact of that collapse on the financial sector of the economy.  Nonetheless, despite the continuing losses incurred by the Collateral Pools, the growing evidence, discussed above, about the risks facing institutions across the economy and the warnings of its own Chief Economist, Defendants held to their refusal to actively manage the portfolios of the Collateral Pools to mitigate further risk.

63.     Moreover, by August 2007, Northern Trust was fully aware that the subprime collapse and growing financial crisis was impacting the liquidity of the markets for fixed income securities.   Indeed, Michael Vardas, the Managing Director of Northern Trust Quantitative Management and Capital Markets, who was responsible for overseeing the SLP, testified that Defendants saw the "market come under some stress in the Summer of 2007" and tried to build liquidity in STEP and Core USA.  According to Vardas, however, Defendants' effort at building liquidity was limited to "allowing the assets in these collateral pools to mature" and "reinvesting them in very short maturity investments."  The nature of the investments to which Defendants, albeit belatedly, sought to refocus the Collateral Pools—according to Vardas: "Money market – very short money market investments, treasury and agency securities" —confirms that the long-term, high-risk securities in which Defendants had previously invested the Collateral Pools were inappropriate.

64.     Despite that knowledge, and the clear risk that the combination of decreasing liquidity and mounting investment losses were poised to deliver a significant blow to the Collateral Pools, Defendants permitted billions of dollars in withdrawals from the Collateral Pools.  Specifically, according to a Northern Trust e-mail authored by Guy Sclafani, a Vice President at Northern Trust Global Investments, STEP "decreased in size over the last 6 months [December 2007 to June 2008] and ***much of the cash we have received has been used to fund departures***, but the market value decrease also reflects a seasonal lag in securities lending activity."  (Emphasis added).  An attachment to that e-mail shows that, during those six months at the height of the financial crisis, STEP decreased by $2.61 billion, over 17%.

65.     Those withdrawals were permitted despite the fact that Defendants were purportedly seeking to build liquidity in the Collateral Pools.   Moreover, investors in the

Collateral Pools who were permitted to withdraw during this period – from December 2007 through September 2008—were able to withdraw by simply bearing their pro-rata share of the loss incurred in the Collateral Pool. In contrast, and as discussed in greater depth below, after September 2008 Defendants only permitted "in-kind" withdrawals—effectively requiring Plaintiff and the Class to purchase distressed securities from the Collateral Pools at full value. Permitting such withdrawals further impaired the liquidity of STEP, and harmed Plaintiff and the members of the Class who remained invested in STEP in reliance on Defendants' ability, as sophisticated fiduciaries, to prudently manage the Collateral Pools.

66.     As the financial crisis continued to escalate, Defendants refused to prudently dispose of the long-term securities held in the Collateral Pools despite growing evidence that major financial institutions, including those in which the Collateral Pools had invested, faced potential collapse. For example, the collapse of Bear Stearns in March 2008, and its purchase by J.P. Morgan for a fire sale price of $10 per share, demonstrated the frailty of the financial giants that formed the backbone of the Collateral Pools' portfolios. That same month, as credit rating agencies downgraded several monoline insurers and finance companies and many financial institutions scrambled to shore up their capital levels, STEP incurred another material loss.

67.     At that time, Northern Trust recognized that the "rising cost of credit coupled with amplified demand for liquidity forced many large market participants to sell fixed income securities at distressed prices" with "the financial markets [at] the brink of a dramatic meltdown," but failed to take the proper steps to mitigate further losses and ensure the liquidity of the Collateral Pools. Rather than focus efforts on divesting the Collateral Pools from the securities of issuers facing significant further losses, Defendants chose to pursue a strategy that—even if successful—would take almost two years to bear fruit.

25

68.     Indeed, rather than actively trying to refocus the Collateral Pools on short-term investments that, while lower yielding, carried less credit risk than the long-term instruments in which Northern Trust had invested, Defendants actually made changes to permit more long-term investments in the Collateral Pools.  Specifically, in or about the Summer of 2007, Northern Trust implemented changes to the investment guidelines for Core USA to permit up to 15% of the portfolio to be invested in securities with maturities longer than three years.  That change was made to increase earnings.

69.     By April 2008, the evidence was irrefutable that Defendants' imprudent investment strategy exposed the Collateral Pools—and STEP, in particular—to significant further losses.  That month, both Moody's and S&P downgraded Sigma Finance Corporation— one of the SIV assets held by STEP—and put the issuer on watch for further downgrades.  Price declines of STEP's $330 million in Sigma holdings following the downgrades contributed a 12.35% annualized monthly decline in STEP's returns. Even though 70% of the Sigma securities STEP held were not due to mature until 2010, Defendants determined not to dispose of those securities, based on the position that "the Sigma portfolio is extremely high quality" and Sigma would "repay the capital notes held in STEP at par on maturity."  That position was unfounded, and wholly at odds with the prevailing market view of Sigma and Theta.

70.     Moreover, Northern Trust knew that Sigma and its corporate sibling, Theta Finance Corp., faced a real risk of failure because they were not being supported by their sponsor, Gordian Knot.  Indeed, a Northern Trust document dated January 2008—almost four months before the April 2008 downgrades of Sigma—identified the inherent weaknesses of SIVs lacking a sponsor, distinguishing SIVs that were sponsored by a financial institution capable of providing financial support from those, such as Sigma and Theta, that lacked such support.  That

document stressed that Northern Trust's strategy of limiting the SIV investments in its money market portfolios to primarily bank-sponsored SIVs "has proved especially valuable in recent weeks as the banks sponsoring five of the nine SIVs the Northern Money Market Fund has invested in have announced plans to put their own capital behind the funding needs of their SIVs."

71.     The risks of investing in SIVS that lack such a sponsor was driven home the following month when in February 2008, two unsupported SIVs in which Northern Trust's money market funds had invested—Whistlejacket Capital LLC and White Pine Finance LLC—defaulted, causing massive losses to those money market funds.  Northern Trust agreed to provide up to $229 million to stabilize those funds in the wake of the SIV losses.  Despite having acknowledged the higher risk presented by unsupported SIVs such as Sigma and Theta, having witnessed the collapse of similarly unsupported SIVs and the impact on Northern Trust funds, and the significant downgrades of Sigma and Theta, Defendants maintained their position that those investments would continue to perform if held to maturity.  The more than $400 million of Sigma and Theta securities in STEP would not fully mature, however, for over one year in the case of Theta and for over three years in the case of Sigma.

72.     At that time, Defendants understood that the situation in the Collateral Pools was dire.  Michael Vardas, the Northern Trust Managing Director overseeing the SLP, testified repeatedly that, as of April 2008, Northern Trust "would not be going out and selling STEP as an investment vehicle to new prospects."  Despite the view that STEP was no longer an appropriate investment vehicle, Defendants continued their self-interested strategy of simply holding on to the long-term securities in STEP and the other Collateral Pools, which became increasingly risky as the financial crisis escalated.  Indeed, in his testimony, Vardas confirmed that, as of April

2008, Defendants' efforts to increase liquidity in STEP remained limited to "predominantly allowing assets to mature and reinvesting proceeds in shorter dated investments."

73. Internal Northern Trust documents show that Defendants saw the need to increase liquidity more quickly, but refused to incur any losses in order to do so. For example, an internal draft letter dated May 12, 2008 written by Guy Sclafani, the Vice President at Northern Trust Global Investments, stated, "We would like to implement a change as quickly as possible but we do not want to realize any losses in the STEP fund if they can be avoided. Therefore implementing a change may take some time. We estimate it may take between 6 and 18 months to restructure the securities lending pool." That same draft letter also shows that, as of May 2008, STEP was not an appropriate investment for the Northern Trust Commingled Lending Funds in which Plaintiffs and the Class invested. Specifically, the letter states that Northern Trust was "reconsider[ing] the structure of the securities lending collateral pool for these index securities. We are considering a number of options including reducing the allocation to STEP in the pool *as well as eliminating it entirely....*" (Emphasis added). In another internal document, Kendall Kay, a Senior Vice President at Northern Trust Global Investments, expressed his agreement with Sclafani's letter, writing "I think this works."

74. In September 2008, STEP plummeted in value as Northern Trust declared STEP's investments in securities issued by Lehman Brothers and the SIVs, Sigma and Theta, had become "permanently impaired." These securities were transferred from STEP to a liquidation account, and the losses on those investments became fully realized. Core USA also incurred a significant loss on its Lehman Brothers investment at that time. Despite the complete collapse of Lehman Brothers, Sigma and Theta, Defendants, hampered by a disabling conflict of interest, refused to divest the Collateral Pools of similarly impaired securities.

75.     Beyond the general economic factors that should have apprised these Defendants that the investments in Lehman Brothers, Sigma and Theta held significant risk for the purportedly conservative Collateral Pools, specific facts about those issuers raised red flags prior to September 2008 for an investment manager such as Northern Trust, which had already been warned by its Chief Economist of the risks facing major banks. For example, in May 2008, David Einhorn—a prominent investment manager who runs hedge fund Greenlight Capital— publicly questioned the accuracy of Lehman Brothers' financial reports, and provided compelling evidence that Lehman Brothers was concealing the extent of its losses. In June 2008, Lehman Brothers disclosed material exposure to the mortgage crisis, and took a $3 billion write-down of commercial and residential mortgages and mortgage-backed securities and real estate holdings. In response to that disclosure, Einhorn again questioned the accuracy of Lehman Brothers' financial reporting, arguing that the losses Lehman Brothers had just disclosed had in fact occurred months earlier. On June 10, 2008, Wachovia issued an analyst report titled "Too Many Inconsistencies," that downgraded Lehman Brothers, citing the lack of transparency concerning Lehman Brothers' exposure to the mortgage meltdown. These disclosures—almost three months before Lehman Brothers' bankruptcy—were imprudently disregarded by Defendants.

76.     Similarly, the collapse of Sigma and Theta should not have been surprising to Northern Trust, had they prudently followed the developments concerning those SIVs. The reduced liquidity in the fixed-income market in August 2007—which Defendants were aware of—had a significant impact on SIVs, whose business model involves buying and selling fixed-income securities. Between August and October of 2007, more than a dozen SIVs failed as the credit rating agencies lowered ratings due to concern about the quality of assets held by SIVs.

77.     In October 2007, *Fortune* magazine railed against investments in SIVs—which it called "shadowy debt instruments"—by commingled funds such as mutual funds.  By December 2007, observers were specifically warning that Sigma—which had an enormous amount of debt coming due in 2008—was at significant risk of failure.  For example, a December 17, 2007, article on the website of the Financial Times, "Second Wave of SIV Liquidity Problems Looms," warned of a "liquidity squeeze [that] will affect some SIVs more than others.  Sigma Finance, run by Gordian Knot, accounts for 22.5 percent of all MTNs [medium term notes] issued by all SIVs.  It must repay about $22.5bn by the end of September [2008] and another $2.5bn by the end of the quarter."   In January 2008, an analyst report by Citigroup voiced further concerns about Gordian Knot's SIVs, noting that Sigma was the "only non-bank sponsored SIV still looking to secure support."  The report provided fresh warnings about the massive obligations that Sigma had to satisfy in 2008.

78.     When, in April 2008 the ratings of Sigma securities were cut, an article on *Bloomberg News* tied the downgrade to Sigma's need to "refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow.…"

79.     Thus, the risks facing Sigma and Theta over the coming year should have been clear to Defendants.  Coupled with Defendants own differentiation between the risks posed by unsupported SIVs, and Northern Trust's experience with the failure of two such SIVs in its money market fund in February 2008, followed by the downgrade of Sigma [and Theta] in April 2008, the decision by Defendants to continue holding those securities with the expectation that they would perform to maturity over the course of up to three years was highly imprudent.

80.     For these reasons, the losses incurred in STEP and Core USA on Lehman Brothers securities, and the losses incurred in STEP on Sigma and Theta securities, were

avoidable had Northern Trust prudently managed the Collateral Pools.

81.     When the Lehman Brothers, Sigma and Theta losses were realized in September 2008, Northern Trust implemented limitations on withdrawals from the Collateral Pools. Specifically, Northern Trust required an SLP participant seeking to withdraw from the SLP to take an "in-kind" withdrawal of that participant's pro rata share of the Collateral Pools.  That meant that the withdrawing participant would be required to contribute cash equal to the book value of its share of the securities held in the Collateral Pool and would, in turn, receive an allocation of the securities in the Pool—including high-risk and long-term securities with a current value far below the cash contribution.  Previously, SLP participants had been required to withdraw and, if the Collateral Pools carried an unrealized loss at the time of the withdrawal, were only required to cover that loss, and thereby avoid future losses on the imprudent investments made by Defendants.

82.     Similarly, indirect SLP participants who invested in the Commingled Lending Funds could only withdraw from those Funds by accepting an in-kind distribution of securities from the Collateral Pools.  Thus, an investor in a Commingled Lending Fund that was invested in the common stock of companies on the S&P 400 index, such as Chicago Teachers, could only withdraw from that Fund by accepting an allocation of the fixed income securities held in the Collateral Pools—including mortgage backed securities—which were wholly distinct from the securities in which the Fund had invested.

83.     Moreover, the new withdrawal limitations effectively locked SLP participants into the Collateral Pools.  The cash contribution required to effect an "in-kind" withdrawal presented an onerous, if not impossible, hurdle that Plaintiffs and the Class could not meet without difficulty, both because of the amount of cash necessary to effect a withdrawal, the risky

nature of the securities the withdrawing SLP participant would receive and the need to retain an investment advisor to then manage those high-risk, long-term and illiquid securities. As a result, Plaintiffs and the Class had no real choice but to remain in the SLP, and remain exposed to the risks in the Collateral Pools, even as the economy worsened after September 2008.

84.     As a result, Plaintiffs and the Class incurred further harm as other risky securities held in STEP and Core USA resulted in additional realized losses. As with the losses incurred on investments in Lehman Brothers, Sigma and Theta, those losses could have been avoided had Defendants heeded and responded to the warnings of Northern Trust's Chief Economist, the evidence in 2007 that major financial institutions faced risks of massive losses and potential collapse, or the specific red flags about the issuers of securities held in the Collateral Pools.

85.     For example, in 2009, STEP and Core USA incurred significant realized losses on securities issued by CIT, a bank that was extensively involved in residential mortgage lending and other consumer loans. Long before those losses were incurred, CIT disclosed that it has hundreds of millions of dollars as a result of risky mortgage and consumer lending. Indeed, during the final half of 2007, CIT incurred over $1.5 billion in write-downs, charges and provisions for losses tied to its portfolio of subprime mortgage loans. In the first quarter of 2008, CIT disclosed an additional $218 million charge to further reduce the value of its mortgage portfolio and disclosed that it faced almost $200 million in additional losses on its portfolio of student loans. By mid-2008, CIT had disposed of its portfolio of subprime mortgages, receiving less than half of what the company had previously claimed the assets were worth. Given the purportedly conservative nature of the Collateral Pools, Defendants' decision to continue holding fixed income securities issued by CIT in the face of the mounting disclosures about that company's financial condition over the course of more than a year constituted a violation of their

fiduciary and contractual duties.

86.     The losses incurred on CIT included losses on securities with a book value of more than $260 million that, when held in the Collateral Pools when the news about CIT's losses became known in mid-2007, were not due to mature for almost two years or more.

87.     In addition to CIT, the Collateral Pools incurred additional realized losses after the withdrawal limitations were implemented that were similarly avoidable because significant red flags existed about the issuers of those securities, and their exposure to losses tied to mortgages or other consumer debt.  These included Sallie Mae, a student loan company that, as early as January 2008, disclosed that it faced $750 million in losses on risky loans, Capmark Financial, a mortgage and real estate investment firm, and Greenpoint Mortgage, a mortgage lender that issued mortgage-backed securities held in STEP.

88.     Plaintiffs and the Class continued to be exposed to further losses by virtue of the high-risk, long-term investments in the Collateral Pools, which carry billions of dollars in unrealized losses.  These investments include over $120 million (par value) in various mortgage-backed securities held in Core USA issued by entities related to Goldman Sachs, J.P. Morgan and Thornburg Mortgage, Inc. that are currently the subject of class action lawsuits—the first of which was filed in March 2008—that allege that the quality of those securities was misrepresented.

89.     Defendants have taken the position that Plaintiffs and the Class are liable for the realized and unrealized losses incurred in the Collateral Pools.  To offset the realized losses, Defendants improperly redirected earnings from securities lending that were due to Plaintiffs and the Class and applied those earnings to offset the realized losses in the Collateral Pools. Defendants then demanded, and continue to demand, that Plaintiffs and the Class reimburse the

Collateral Pools for the realized losses that resulted from Defendants misconduct. And because of the withdrawal limitations Defendants implemented, Plaintiffs and the Class lack the ability to freely exit the SLP or the Commingled Lending Funds participating therein.

## V.    CLASS ACTION ALLEGATIONS

90.    Chicago Teachers and Atlanta Firefighters bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf the following class of persons similarly situated (the "Class"):

> All persons or entities that are not governed by ERISA and that invested or maintained investments or assets, directly or indirectly, between July 1, 2007 and the present (the "Class Period") in any Collateral Pool, as defined herein, managed or operated by Northern Trust, and were damaged thereby.

91.    Excluded from the Class are defendants herein, any subsidiaries or affiliates of the defendants, officers and directors of the defendants, heirs, successors or assignees of any of the defendants or their officers and directors, and any entity in which any defendant has a controlling or substantial interest, except for any Commingled Lending Funds, as defined herein, which are expressly included in the Class.

92.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Chicago Teachers and Atlanta Firefighters at this time, and can only be ascertained through appropriate discovery, Chicago Teachers and Atlanta Firefighters believe that hundreds of investors throughout the country participated in the SLP and invested, either directly or indirectly, in the Collateral Pools during the Class Period and sustained losses as a result of Defendants' misconduct. Direct and indirect SLP participants and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail.

93. Chicago Teachers' and Atlanta Firefighters' claims are typical of the claims of the members of the Class because they arise from Defendants' fiduciary status and their violation of those duties, which applies uniformly to all members of the Class; are based on substantially similar or uniform agreements governing the participation in and administration of the SLP that were entered into between Chicago Teachers, Atlanta Firefighters and by or on behalf of all members of the Class and Defendants; and arise from Defendants' uniform course of conduct in failing to properly exercise its discretionary authority in administering the SLP and investing Collateral Pool assets in good faith. If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

94. Proceeding as a class action is particularly appropriate here because the Collateral Pool assets managed by Defendants treat any losses as proportional to all investors, and, therefore, Defendants' imprudent actions and other breaches affected all Class members in the same manner.

95. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

   a. Whether Defendants are fiduciaries to the Class members;

   b. Whether Defendants breached their fiduciary duties to the Class;

   c. Whether Defendants' acts proximately caused losses to the Class and, if so, the appropriate relief to which they are entitled;

   d. Whether Defendants breached terms of their contracts with the Class members;

e.    Whether Defendants breached their contractual duties of good faith and fair dealing with respect to the Class; and

f.    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

96.    A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.   As the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

97.    In addition, prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Prosecution of separate actions would also create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

98.    Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## COUNT I

## CLAIM FOR BREACH OF FIDUCIARY DUTY

99.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

100.    The Defendants owed and owe fiduciary duties to Plaintiffs and members of the

Class. By reason of their fiduciary relationships, Defendants specifically owed and owe Plaintiffs and members of the Class the highest obligation of due care, good faith and loyalty in the administration of the SLP and the management of the Collateral Pools.

101. Specifically, as the investment manager charged with managing the investment of the Collateral Pools for the benefit of Plaintiffs and the Class, including both direct and indirect participants in the SLP, Northern Trust had a fiduciary duty to manage those investments prudently and within the narrow purpose for which the Collateral Pools were established: the conservative investment of cash collateral in short-term, low-risk and highly liquid securities with the objective of maintaining principal.

102. Northern Trust has acknowledged its status fiduciary with respect to participants in the SLP, both in materials produced by Defendants, by the terms of the securities lending agreements Northern Trust entered into with direct participants in the SLP and through agreements with the Commingled Lending Fund in which indirect SLP participants invested. Moreover, Northern Trust's role as fiduciary to all participants in the SLP is confirmed by the FFIEC Policy, which was expressly incorporated by reference into the securities lending agreements.

103. As a fiduciary to Plaintiffs and the Class, Northern Trust had full discretion to manage the Collateral Pools for the benefit of Plaintiffs and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein. That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Plaintiffs and the Class.

104. Northern Trust breached its fiduciary duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid.

Northern Trust further breached its fiduciary duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

105.     As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of Plaintiffs and the Class.  Specifically, the structure of Defendants' compensation for managing the Collateral Pools motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk that would be borne solely by Plaintiffs and the Class.  Further, concern about the risk that Northern Trust would be required to consolidate the Collateral Pools if the Pools incurred realized losses marred Defendants' management of the Pools, and motivated Defendants to retain impaired and at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses.  Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Plaintiffs and the Class.

106.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

## COUNT II

### CLAIM FOR BREACH OF CONTRACT

107.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

108.     The agreements that Northern Trust entered into with the direct participants in the SLP, and the agreements entered into with the Commingled Lending Funds on behalf of indirect participants in the SLP, required Northern Trust to "make a reasoned determination of

the quality and suitability of Collateral investments through adequate analysis of all material public information available to Northern."

109.    Those agreements imbued Northern Trust with full discretion to manage the Collateral Pools for the benefit of Plaintiffs and the Class, within the confines of the narrow purpose and objective of those Pools, as described herein.

110.    Northern Trust breached its contractual duties by imprudently investing the Collateral Pools in securities that were high-risk, carried long maturities and/or were illiquid. Northern Trust further breached its fiduciary duties by failing to prudently manage the Collateral Pools in response to the clear evidence of a growing financial crisis.

111.    As a direct and proximate result of Defendants' breaches of contract, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

## COUNT III

### CLAIM FOR BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

112.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

113.    Defendants agreements with Plaintiffs and the Class, including agreements with the Commingled Lending Funds on behalf of investors therein, gave rise to a duty of good faith and fair dealing.  That duty required Defendants to prudently manage the Collateral Pools, and to act in the interest of and for the benefit of Plaintiffs and the Class.  As set forth above, Defendants' management of the Collateral Pools was marred by conflicts of interest that prevented Defendants from managing the Pools solely in the interests of Plaintiffs and the Class. Specifically, the structure of Defendants' compensation for managing the Collateral Pools

39

motivated Defendants to invest the Pools in higher-risk and longer-term securities, in order to increase their profits without regard for the increased risk that would be borne solely by Plaintiffs and the Class. Further, concern about the risk that Northern Trust would be required to consolidate the Collateral Pools if the Pools incurred realized losses marred Defendants' management of the Pools, and motivated Defendants to retain impaired and at-risk securities in the Pools rather than selling those securities at a loss to mitigate risk of further losses. Those conflicts of interest caused Defendants to breach their duties of good faith and fair dealing, and caused harm to Plaintiffs and the Class.

114.    As a direct and proximate result of the breaches of Defendants' duty of good faith and fair dealing, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     A determination that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

(b)     A declaration that Defendants have breached their fiduciary duties to Plaintiffs and the Class;

(c)     A declaration that Defendants have breached their contractual duties to Plaintiffs and the Class;

(d)     A declaration that Defendants have breached their duties of good faith and fair dealing to Plaintiffs and the Class;

(e)     An Order that Plaintiffs and the Class are not liable for the realized and unrealized losses incurred in the Collateral Pools as a result the Defendants' breaches of their fiduciary and/or contractual duties;

(f)     An Order lifting the improper withdrawal limitations that Defendants imposed on the Collateral Pools and the SLP;

(g)     Awarding to Plaintiffs and the Class an appropriate measure of damages to be determined at trial;

(h)     An Order awarding attorney fees pursuant to the common fund doctrine and other applicable law; and

(i)     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  January 29, 2010

                          /s/ Avi Josefson
                  Avi Josefson
                  2835 N. Sheffield Avenue, Suite 409
                  Chicago, Illinois 60657
                  Tel: 773-883-5382
                  avi@blbglaw.com
                  Illinois Bar No. 6272453

                  Gerald H. Silk
                  Michael D. Blatchley
                  1285 Avenue of the Americas, 38th Floor
                  New York, New York 10019
                  Tel:  212-554-1400
                  Fax:  212-554-1444

                  Blair A. Nicholas
                  12481 High Bluff Drive, Suite 300

San Diego, CA 92130
Tel: 858-793-0070
Fax: 858-793-0323

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

*Counsel for Public School Teachers' Pension &
Retirement Fund of Chicago and the City of Atlanta
Firefighters' Pension Plan*